STATE OF NEW HAMPSHIRE

| | |
|---|---|
| HILLSBOROUGH<br>NORTHERN DIVISION | SUPERIOR COURT |

Lynn M. Kramer

v.

PROCON, LLC and Stebbins Commercial Properties, LLC

Case No. 216-2021-CV-00366 _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

**Parties**

1. The Plaintiff, Lynn M. Kramer, resides at 5 Bills Way, Bedford, NH 03110.

2. Defendant, PROCON LLC (hereinafter "PROCON"), is a domestic limited liability company with a principal place of business at 1359 Hooksett Road, Hooksett, New Hampshire 03106. PROCON's Registered Agent is Lyndsee D. Paskalis, Esq., 889 Elm Street, 6th Floor, Manchester, New Hampshire 03101.

3. Defendant, Stebbins Commercial Properties, LLC (hereinafter "Stebbins"), is a domestic limited liability company with a principal place of business at 1359 Hooksett Road, Hooksett, New Hampshire 03106. Stebbins Registered Agent is Lyndsee D. Paskalis, Esq., 889 Elm Street, 6th Floor, Manchester, New Hampshire 03101.

**Jurisdiction and Venue**

4. At all times relevant hereto, PROCON and Stebbins (hereinafter collectively "Defendants") have engaged in an industry affecting commerce and have had more than 50

employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

5. Upon information and belief, at all times relevant hereto, PROCON has engaged in an industry affecting commerce and has had more than 20 employees working each day in each of 20 or more calendar weeks in the current or preceding calendar year.

6. Venue is proper, as PROCON is a domestic nonprofit corporation registered to do business in New Hampshire, and the unlawful acts complained of were committed within the State of New Hampshire.

7. On or about December 4, 2020, Ms. Kramer filed a Charge of Discrimination and Retaliation (hereinafter "Charge") with the New Hampshire Human Rights Commission and the Equal Opportunity Commission, in accordance with the requirements of 42 U.S.C. §12101 *et seq*.

8. Ms. Kramer's Charge was filed with the New Hampshire Human Rights Commission and the Equal Employment Opportunity Commission within 180 days after the unlawful employment acts were committed.

9. On June 3, 2021, the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue with respect to her charges of discrimination, thus satisfying the procedural prerequisites established by 42 U.S.C. 2000(e) - 5(b) and (3).  *See* <u>Exhibit A</u>, Notice of Right to Sue, attached hereto and incorporated herein by reference.

10. This Complaint is filed fewer than 90 days after receipt of the Notice of Right to Sue, dated June 3, 2021 (as attached).

## Facts

11. Ms. Kramer began working for PROCON on April 1, 2011 and continued her work there until the discriminatory termination of her employment on July 13, 2020.

12. Ms. Kramer was hired to the position of Senior Project Manager.

13. During her employment with Defendants, her performance was excellent.

14. In 2015, Ms. Kramer was promoted to the position of Project Executive, and continued in that position until the time of her termination.

15. Upon information and belief, PROCON has been in business for 85 years, has more than 100 employees, and has never had a female officer.

16. Throughout the entirety of Ms. Kramer's employment with Defendants, she was discriminated against because of her gender as follows:

    a. Defendants paid her less than males who performed equal work;[1]

    b. Defendants discriminated against her on the basis of her gender, including, but not limited to, denying her employment benefits because of her gender;

    c. Defendants created a work environment that was hostile towards women and was hostile for Ms. Kramer; and

    d. Defendants terminated Ms. Kramer because of her gender and/or in retaliation for her reporting gender discrimination to Defendants.

## Equal Pay Act Violations and Gender Discrimination

17. At the time of Ms. Kramer's hire on April 1, 2011, she was paid a salary of $104,000 in her position of Senior Project Manager.

---

[1] Plaintiff's Equal Pay Act lawsuit is presently pending in the Federal District Court.

18. Ms. Kramer had asked to be paid a salary of $150,000 at the time of her hire, but Mr. Lance Bennett, PROCON's Co-President, refused to pay Ms. Kramer that salary, despite the fact that she had been making $150,000 in her prior position.

19. It was suggested to Ms. Kramer at the time of her hire, however, that she would be given a review and a raise within six months,

20. Ms. Kramer was not given a review and a raise within 6 months of her hire.

21. As a result, between 2011 and 2015, Ms. Kramer routinely asked Mr. Bennett for promotions and raises.

22. In 2012 or 2013, Mr. Bennett told Ms. Kramer that it seemed like she had one foot out the door because if her husband got a better job, she would probably leave. At that time, Ms. Kramer and her husband were still living in Westborough, Massachusetts, and Ms. Kramer was commuting 75 miles one way to get to her job with Defendants.

23. In response, Ms. Kramer and her husband bought a house in Bedford, New Hampshire in August 2013. In part, they did that so that Ms. Kramer could prove to Mr. Bennett how committed she was to her job.

24. Despite moving to Bedford in August 2013 for her job, Mr. Bennett did not promote Ms. Kramer to Project Executive until June 2015.

25. As of the time of Ms. Kramer's termination on July 13, 2020, she held the position of Project Executive and was paid $177,000 in salary (which included two extra discretionary paychecks, and a car allowance) plus bonuses and benefits. Without the car allowance and discretionary paychecks her salary was actually $160,000.

26. In Ms. Kramer's capacity as Project Executive, she oversaw four to five projects at a time which caused her to supervise a total of eight to ten Project Managers and Assistant Project Managers.

27. In early 2020, Mr. Bennett asked Daniel Messier, PROCON's Senior Vice President and Project Executive and Ms. Kramer to conduct performance reviews for employees in PROCON's Operations Division ("Operations"). The review process involved reviewing each employee's performance and informing the employee of any salary increase for the upcoming year.

28. During that review process, Ms. Kramer became privy to her subordinates' salary information for the first time.

29. Specifically, Human Resources informed Mr. Messier and Ms. Kramer what each employee's salary was, and Mr. Bennett advised what raises would be given to each employee. Mr. Messier and Ms. Kramer relayed this information to each employee.

30. Ms. Kramer was not given any authority in setting employees' compensation or raises. Upon information and belief, Mr. Bennett and Mr. James Loft, PROCON's co-president, had sole control over compensation decisions at PROCON.

31. Through the compensation information that was shared with Ms. Kramer, she learned that the women in Operations were grossly underpaid in comparison to the men who worked in Operations.

32. When Ms. Kramer was first hired, she asked for a salary of $150,000, an amount commensurate with her previous experience and consistent with what she believed the market value was for a person with her credentials.

33. Defendants claimed that $150,000 was completely out of range for the New Hampshire market, and said they were willing to pay Ms. Kramer only $104,000.

34. While conducting performance reviews in 2020, Ms. Kramer learned that multiple male Senior Project Managers earned an annual salary of $150,000 or more.

35. Those Senior Project Managers performed the same or very similar work to the work Ms. Kramer had performed as a Senior Project Manager prior to her promotion in 2015.

36. Defendants have sole control over documents and information related to their employees' salaries; however, upon information and belief, some of those Senior Project Managers (all males) had salaries in 2019 that were greater than Ms. Kramer's, even though their positions were subordinate to hers.

37. By way of example, in 2019, among Senior Project Managers, one earned $176,000, one earned $155,000, one earned $143,000, one earned $153,000, and one earned $162,000.  Clearly, some of the Senior Project Managers were making more than Ms. Kramer was as a Project Executive, while others were making significantly more than she had made during the time that she was a Senior Project Manager.

38. Upon information and belief, Defendants' gender pay gap was even more egregious during Ms. Kramer's earlier years of employment.

39. For example, when Ms. Kramer was promoted from Senior Project Manager to Project Executive in 2015, she received a raise from $119,000 to $125,000 per year, and then a second raise from $125,000 to $135,000 per year.

40. Yet, in 2020, at least four male Senior Project Managers earned salaries of $150,000 or more and all earned significantly more than Ms. Kramer did in that role.

41. Annual adjustments for inflation do not explain this pay disparity.

42. Ms. Kramer's salary in 2020 (as Project Executive) was $160,000 (plus the car allowance rolled into her salary plus two extra discretionary bonus paychecks).

43. Even after her promotion to Project Executive, Ms. Kramer was earning less than male employees who were subordinate to her.

44. The full details of the disparate pay between men and women are supported by documentation solely within Defendants' control.

45. In Ms. Kramer's role as Project Executive, her most similar male counterpart was Daniel Messier. Mr. Messier and Ms. Kramer performed substantially equal work, including shared supervisory responsibilities for the Operations Division and similar work responsibilities, such as managing projects and reporting the status of projects during job officer meetings.

46. Upon information and belief, Mr. Messier was consistently paid more than Ms. Kramer to perform equal work.

47. Defendants discriminated against women in their employ by offering and paying higher wages and benefits to male employees for equal work on jobs requiring equal skill, effort and responsibility, and which were performed under similar working conditions.

**Gender Discrimination and Hostile Work Environment on the Basis of Gender**

48. Defendants provided preferential treatment to males, while depriving Ms. Kramer of such preferential treatment.

49. By way of example, Mr. Bennett refused to recommend Ms. Kramer for membership on the Board for Associated Builders and Contractors of NH/VT ("ABC").

50. Ms. Kramer had specifically asked Mr. Bennett to recommend her for membership on the ABC. In fact, Ms. Kramer had heard that the ABC was looking for female executives to join ABC.

51. After Ms. Kramer asked Mr. Bennett to recommend her for membership on the ABC, he instead recommended numerous male Senior Project Managers for such membership (including male employees who were Ms. Kramer's subordinates).

52. Ms. Kramer met with Mr. Bennett to ask him why he had recommended male employees who were subordinate to her to the ABC, but not Ms. Kramer, and he falsely claimed that he did not know that Ms. Kramer wanted to be recommended to ABC.

53. During Ms. Kramer's discussion with Mr. Bennett about this issue, she specifically asked him if he had not recommended her because she is a woman. He denied it and said that she would be too busy to be on the ABC.

54. Mr. Bennett's statement that Ms. Kramer would be too busy was false.

55. Defendants had a mentoring program, and Ms. Kramer asked to be a part of that program.

56. Ms. Kramer wanted to be a mentee under Mr. Bennett.

57. Instead, Mr. Bennett took on a male employee as his mentee, and Ms. Kramer was deprived of the opportunity to have a mentor.

58. Mr. Bennett excluded Ms. Kramer from one-on-one lunches that were offered to men in Operations and which contributed to their professional development.

59. Mr. Bennett circumvented Ms. Kramer's authority by meeting with her subordinates about projects and not including Ms. Kramer (he did not do this to her peer, Daniel Messier).

60. Defendants, through their leadership, created a hostile work environment for women, including Ms. Kramer.

61. For example, while speaking to the entire company at PROCON, Mr. Messier referred to a female colleague as his "day wife."

62. In addition, Mr. Bennett humiliated a female employee by berating her in the lunchroom in front of numerous coworkers, which was something he never did to male employees.

63. Likewise, Mr. Bennett would complain when Ms. Kramer met with their Accountant, Linda Moquin, on a project, and insinuated that because they were both women, they were not doing any work when they met. His insinuation was wrong and was clearly discriminatory toward them based on their gender.

64. Mr. Bennett would also negatively comment on women's intelligence (Ms. Kramer' and others). On one occasion, he asked Defendants' in-house counsel, Kim Cochran, "are you really that stupid?"

65. During meetings about Ms. Kramer's projects, Mr. Bennett would ignore her and speak only to the men on the project. On more than on occasion, when Ms. Kramer tried to answer, he would cut her off and say, "Lynn, if I wanted your answer, I would have asked you."

66. On more than one occasion, Ms. Kramer confronted Mr. Bennett about his ignoring her. In response, Mr. Bennett told Ms. Kramer that no one listens to her, and that he only listens to the first four words Ms. Kramer says and then tunes her out.

67. One time Ms. Kramer walked into Mr. Bennett's office and he looked at her and said, "What the F___ do you want?"

68. During Ms. Kramer's 2019 performance review, which was held in April 2019, she informed Mr. Bennett that her long-term goal was to become the first female officer at PROCON. Mr. Bennett responded, "What if I don't think you can handle it?" and refused to provide Ms.

Kramer with any mentorship or advice about further advancement in the company. Mr. Bennett never treated men in this manner.

69. Because Mr. Bennett did not give Ms. Kramer a written performance evaluation at that time, she typed up a summary of what had occurred during her in-person review with Mr. Bennett and emailed it to Mr. Bennett, and to Tracy Harris, who was the head of Human Resources for Defendants.

70. In May 2019, Mr. Bennett emailed Ms. Kramer in response to her summary, merely saying, "Sorry Lynn. I can't agree with this, so I'll set up another meeting to go over your summary." He never did.

71. Ms. Kramer reported this to Ms. Harris. In fact, Ms. Harris was copied on the May 2019 email that Mr. Bennett sent to Ms. Kramer in response to her summary. Ms. Kramer told Ms. Harris that she thought Mr. Bennett did not want Ms. Kramer becoming an officer. At that point, every officer in the company was a male. To Ms. Kramer's knowledge, no action was taken based on her complaint.

72. After that, Mr. Bennett did not speak with Ms. Kramer about professional matters for approximately nine months. Instead, he began to undermine her work and her authority as a Project Executive for Defendants.

73. In the summer of 2019, just a few months after Ms. Kramer's April 2019 review in which she had told Mr. Bennett that her goal was to become an officer of PROCON, Ms. Kramer continued her work on a project for Tufts that had started in the early fall of 2018.

74. Mr. Bennett started having meetings with the PROCON Project Managers on Ms. Kramer's team for the Tufts project, with whom she should have been meeting, without Ms.

Kramer. It was clear that he was undermining Ms. Kramer to her immediate subordinates on the project on which she was the Project Executive.

75. It was clear that, at that time, Ms. Kramer's career at PROCON had taken a nosedive. Ms. Kramer believes that occurred because Mr. Bennett wanted to keep her from advancing in the company because of her gender, even though she was excellent at her job as Project Executive and deserved to be promoted to a position of officer (like her peer, Daniel Messier, who was a Project Executive and Vice President).

76. Throughout Ms. Kramer's employment with Defendants, she reported the gender discrimination and hostile environment to Tracy Harris, who was the head of the Human Resources Department for the Defendants. Ms. Kramer met with Ms. Harris many times. Ms. Kramer asked Ms. Harris how she could do her job when this was how Mr. Bennett treated her. Ms. Kramer told Ms. Harris that she believed that Mr. Bennett had a problem with her because she is a female. At one point, Ms. Harris told Ms. Kramer that Mr. Bennett is a jerk to a lot of people. Ms. Kramer told Ms. Harris that she had never heard Mr. Bennett speak to any man the way he spoke to Ms. Kramer.

77. Similarly, Mr. Bennett would regularly make negative and disparaging comments about in-house counsel, Kim Cochran. He would belittle her, criticize her, and suggest that she was incompetent to do her job.

78. When Ms. Kramer would report the discrimination and hostile environment to Ms. Harris, Ms. Harris would tell her that things would never change.

**Termination Due to Gender Discrimination and/or Retaliation**

79. Defendants' layoffs in 2020 unlawfully targeted women.

80. At the beginning of 2020, there were four women and 22 men working in Operations at PROCON.

81. The four women included Ms. Kramer, two Assistant Project Managers, and one woman in an administrative role.

82. The two Assistant Project Managers were Kim Pyszka and Leslie DelSesto.

83. In or around April 2020, Defendants began terminating staff.

84. In April 2020, Defendants terminated Ms. Pyszka and Ms. DelSesto, making Ms. Kramer the only female remaining in Operations who was not in an administrative role.

85. Ms. Kramer was terminated on July 13, 2020.

86. As of the time of her termination, Defendants retained 17 males in Operations (including males junior to Ms. Kramer).

87. Thus, between April 2020 and July 13, 2020, when Ms. Kramer was terminated, Defendants terminated 100% of the women working in engineering/project management roles, but terminated only 23% of the men working in similar roles.

88. There was no legitimate, non-discriminatory and/or non-retaliatory reason for Ms. Kramer's termination.

89. Ms. Kramer was the most senior female employee in the Operations Division.

90. Moreover, in July 2020, prior to her termination, Ms. Kramer had told Mr. Bennett that she was willing to step down to a Senior Project Manager position and/or take over Senior Project Manager duties if it would be helpful to the company during the COVID-19 crisis.

91. Upon information and belief, Defendants' layoffs unlawfully targeted women in an already male-dominated department (Operations) and company.

92. Ms. Kramer also believes that her termination was motivated by retaliation for her raising gender complaints to Mr. Bennett and to Human Resources.

93. As a result of the unequal pay, the gender discrimination, the hostile environment, and the discriminatory and/or retaliatory termination of her employment, Ms. Kramer has suffered damages.

94. Since the unlawful termination of her employment, Ms. Kramer has been unable to secure alternative, comparable work.

95. Since her unlawful termination on July 13, 2020, Ms. Kramer has incurred, and will continue to incur, lost wages and benefits.

96. In addition, Defendants' discrimination, hostile environment, retaliation and unlawful discriminatory and/or retaliatory termination has caused, and continues to cause, Ms. Kramer emotional harm.

97. In addition, Ms. Kramer has incurred, and will incur, attorneys' fees and costs.

98. Ms. Kramer seeks all recoverable damages available pursuant to NH RSA 354-A and Title VII.

### Count I – Gender Discrimination – N.H. RSA 354-A

99. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

100. As described above, Plaintiff was subjected to discrimination on the basis of her gender by the Defendants throughout her employment.

101. The discrimination culminated in the Defendants terminating her from her position with the Defendants on July 13, 2020.

102. All of the Defendants' unlawful employment practices as described herein violated N.H. RSA 354-A:7, I.

103. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count II – Gender Discrimination– Title VII

104. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

105. As more particularly described in Count I above, the Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by causing Plaintiff to be subjected to gender discrimination as described in the complaint, and by terminating Plaintiff on the basis of her gender on July 13, 2020.

106. As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

### Count III – Gender-Based Hostile Environment – RSA 354-A

107. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

108. As described throughout Plaintiff's Complaint, Plaintiff was subjected to repeated offensive comments regarding her gender and conduct based upon her gender.

109. The repeated offensive comments and conduct were based on Plaintiff's gender.

110.     The repeated offensive comments and conduct regarding Plaintiff's gender were so severe and/or pervasive that they created an offensive and demeaning work environment for Plaintiff and interfered with her ability to perform her job.

111.     The Defendants had actual knowledge of the gender-based harassment because Plaintiff reported the gender discrimination to the Defendants, specifically, to Human Resources, as described in this Complaint.

112.     Despite reporting the gender-based harassment to the Defendants, the Defendants failed to take appropriate remedial action that would have enabled Plaintiff to continue working without the threat of being subjected to a hostile and inappropriate work environment, as well as the potential for retaliation for reporting the gender-based harassment, which said retaliation did occur as described in the Complaint.

113.     Plaintiff did not welcome, encourage, or consent to the gender-based harassment to which she was subjected as an employee of the Defendants.

114.     The gender-based harassment to which Plaintiff was subjected as an employee of the Defendants has had, and continues to have, a detrimental effect upon her employment and personal well-being.

115.     The Defendants' unlawful employment practices in allowing Plaintiff to be subjected to gender-based harassment and in failing to take prompt remedial action to see to it that the gender-based harassment ended, violated New Hampshire RSA 354-A.

116.     As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages

and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count IV – Gender-Based Hostile Environment – Title VII

117. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

118. As more particularly described in Count III above, the Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by subjecting Plaintiff to gender-based harassment (hostile environment) during her employment with the Defendants as described in this Complaint.

119. As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

### Count V - Retaliation – RSA 354-A

120. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

121. On the heels of Plaintiff reporting gender-based harassment (hostile environment) and gender discrimination to the Defendants, she was subjected to retaliation by Mr. Bennett and by Defendants, as described throughout the Complaint, culminating in termination of her employment on July 13, 2020.

122. The Defendants' unlawful retaliation against Plaintiff for reporting gender discrimination and gender-based harassment (hostile environment) violates N.H. RSA 354-A:7, I.

123. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages

and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

### Count VI – Retaliation – Title VII

124. Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

125. As more particularly described in Count V above, the Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by retaliating against Plaintiff for reporting gender discrimination and gender-based harassment (hostile environment) as described in this Complaint.

126. As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

Respectfully submitted,

LYNN M. KRAMER, Plaintiff

By Her Attorneys
UPTON & HATFIELD, LLP

Date: June 11, 2021          By:   /s/ Heather M. Burns
                                    Heather M. Burns (NHBA #8799)
                                    Lauren S. Irwin (NHBA #10544)
                                    10 Centre Street, PO Box 1090
                                    Concord, NH  03302-1090
                                    (603) 224-7791
                                    hburns@uptonhatfield.com

# EXHIBIT A

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Lynn Kramer<br>5 Bills Way<br>Bedford, NH 03110 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>15 New Sudbury Street, Room 475<br>Boston, MA 02203 |

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16D-2021-00056 | Amon L. Kinsey, Jr., Supervisory Investigator | (617) 865-3672 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other (briefly state)    **Charging Party is pursuing claims in another forum.**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*[signature]*

Feng K. An,
Area Office Director

June 8, 2021

(Date Issued)

Enclosures(s)

cc: **PROCON LLC**
c/o: Thomas Closson, Esq.
JACKSON LEWIS
100 International Drive, Suite 363
Portsmouth, NH 03801

Heather Burns, Esq.
UPTON & HATFIELD
PO Box 1090
Concord, NH 03302